UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| B.R & W.R.,<br><br>Plaintiff,<br><br>v.<br><br>BEACON HEALTH OPTIONS, et al.,<br><br>Defendants. | Case No. 16-cv-04576-MEJ<br><br>**ORDER RE: MOTION TO DISMISS TAC**<br><br>Re: Dkt. No. 37 |

## INTRODUCTION

Pending before the Court is Defendant SAG-AFTRA Health Fund's ("SAG-AFTRA") Motion to Dismiss Plaintiffs B.R. and W.R.'s Third Amended Complaint ("TAC") pursuant to Federal Rule of Civil Procedure 12(b)(6). TAC, Dkt. No. 36; Mot., Dkt. No. 37. Plaintiffs filed an Opposition (Dkt. No. 38) and SAG-AFTRA filed a Reply (Dkt. No. 39). The Court previously vacated the November 2, 2017 hearing and took the matter under submission. Dkt. No. 40. Having considered the parties' positions, the relevant legal authority, and the record in this case, the Court **GRANTS** SAG-AFTRA's Motion for the following reasons.

## BACKGROUND

As it must on a motion to dismiss, the Court takes as true the TAC's well-pleaded allegations.

W.R. is B.R.'s son. TAC ¶ 4. SAG-AFTRA sponsored an employee welfare benefit plan (the "SAG Plan") within the meaning of the Employment Retirement Income Security Act ("ERISA"). *Id.* ¶¶ 1, 6. B.R. and W.R. participated in the SAG Plan, which is a self-funded ERISA plan. *Id.* ¶¶ 5-8.

W.R. has a long and severe history of mental illness, for which he has received extensive

treatment, including medication and in-patient and residential treatment. *Id.* ¶¶ 13-29, 33-52. At some point, "W.R. was admitted to [the University of Utah Neuropsychiatric Hospital ('UNI')] because he was having hallucinations and psychosis, was having violent ideations, and was deemed a danger to himself and to others." *Id.* ¶ 33. His treaters at UNI determined that his "symptoms of significant mood instability with suicidal ideation, psychotic thought patterns, as well as severe patterns of substance abuse caused him to decompensate to the point of becoming absolutely nonfunctional." *Id.* ¶ 34. "[W]ithout inpatient treatment for his mental health and substance abuse disorders," W.R.'s treaters determined he "was at risk of suicide or death due to his pattern of substance abuse." *Id.* ¶ 35. W.R. was next admitted to Ascend Recovery, a residential treatment program, where he was discharged and readmitted multiple times between January and November of 2014. *Id.* ¶¶ 36-41.

In January 2015, after leaving Ascend against medical advice several months earlier, W.R. began suffering from another psychological emergency; his parents traveled to Utah to recover him and assist with his readmission at UNI. *Id.* ¶¶ 41-42. W.R. remained in the psychiatric treatment unit of UNI for 3 to 4 weeks. *Id.* ¶ 42.

"[F]ollowing his discharge from UNI, W.R.'s persistent mental health and substance abuse issues next resulted in his admittance to Spring Lake Rach, another residential treatment center." *Id.* ¶ 43. At the time of this admission, W.R. experienced psychosis, paranoia, and delusional thinking. *Id.* W.R. continued to manifest hallucinatory and paranoid thinking while receiving treatment at Spring Lake Ranch between January and December 2015. *Id.* ¶¶ 44-51.

Plaintiffs timely submitted claims for W.R.'s mental health care treatment at Ascend Recovery and Spring Lake Ranch, and appealed the denial of those claims through the second level appeals. *Id.* ¶¶ 53-56. Plaintiffs allege the denial of the claims was wrongful and in violation of the Plan terms because W.R.'s condition and care needs at the time of his admission to Ascend Recovery qualified as "emergency" treatment pursuant to the terms of the SAG Plan. *Id.* ¶ 57.

Plaintiffs attach the Summary Plan Description ("SPD") for the SAG Plan to the TAC. *See* TAC, Ex. A (SPD). The SPD includes a section entitled "Understanding Your Non-Network

2

Costs" and explains "[n]on-network charges are generally much more expensive and can take a bite out of your pocketbook." *Id.* at 31.[1] The SPD states in its section describing "Hospital Benefits (including Mental Health and Substance Abuse Treatment)" that "[n]on-network services are only covered in the event of an emergency. See page 34 for a description of emergency treatment." *Id.* at 32. The SPD section titled "Emergencies" reads: "Emergency treatment at network and non-network hospitals is covered within 72 hours after an accident or within 24 hours of a sudden and serious illness." *Id.* at 34. It further instructs participants who are admitted to a non-network hospital to call the appropriate Plan administrator "within 48 hours to report the emergency admission" and states that "[y]our care will be reviewed and the coverage will be authorized if it is medically necessary." *Id.* The SPD indicates participants can choose from one of two plans; only Plan I offers mental health and substance abuse benefits. *Id.* Hospital Benefits other than mental health and substance abuse benefits include, among others, emergency treatment, including services billed by the hospital on their statement of charges; inpatient hospice care; network birthing centers; outpatient hospital treatment for diagnostic services and therapy; and outpatient surgery in a hospital. *Id.* at 34-35. Hospital Benefits for Mental Health and Substance Abuse include benefits for inpatient care; alternative levels of care, including residential treatment centers, partial hospital programs, and intensive outpatient programs; and "[e]mergency treatment, including services billed by the hospital on their statement of charges." *Id.* at 35. The SPD section entitled "Non-Covered Hospital Expenses" lists "[a]ll expenses at a non-network hospital, except for emergency treatment as described on page 34." *Id.* at 36.

Plaintiffs allege that the SAG Plan's classification of treatment settings violate the Mental Health Parity and Addictions Equity Act of 2008 ("MHPAEA"). *Id.* ¶¶ 58-82, 85-90. They allege the Plan violates MHPAEA by attempting to characterize all inpatient mental health treatment as either hospital or non-hospital, while allowing inpatient treatment for medical/surgical conditions in non-hospital settings. *Id.* ¶¶ 64, 66-68. Plaintiffs further allege the Plan's administrator unlawfully denied W.R.'s claims for mental health/substance use disorder treatment at an inpatient

---

[1] Page references to the SPD refer to the pagination of the document itself.

3

facility on the purported basis that the Plan does not cover any out-of-network inpatient services for mental health treatment (*id.* ¶¶ 72-73), while the

> Plan does in fact provide benefits for inpatient, out-of-network non-hospital facility care for physical medical/surgical treatment in certain circumstances, including treatment at skilled nursing facilities after transfer from an acute care hospital where the patient's care is still considered acute, inpatient physical and rehabilitative therapy after transfer from an acute care hospital where the patient's care is still considered acute, and for pulmonary, cardiac and cerebrovascular rehabilitation.

(*id.* ¶ 74).

Plaintiffs also allege the SAG Plan violates the California Mental Health Parity Act ("California Parity Act"), Cal. Health & Safety Code § 1374.72, which requires health care plans to provide medically necessary diagnosis, care, and treatment for the treatment of specified mental illnesses at a level equal to the provision of benefits for physical illnesses. *Id.* ¶ 83. W.R.'s mental health care providers recommended treatment at Ascend Recovery and Spring Lake Ranch to treat his multiple psychiatric disorders. *Id.* ¶ 84.

Plaintiffs allege the SAG Plan violates both the MHPAEA and the California Parity Act because it provides "zero coverage for inpatient, out-of-network intermediate levels of care for mental health/substance abuse treatment while providing such coverage for inpatient out-of-network intermediate levels of care for physical medical/surgical treatment." *Id.* ¶ 86.

Finally, Plaintiffs allege that SAG-AFTRA did not maintain an adequate network of mental health and substance abuse providers, and never proposed in-network alternatives for W.R.'s residential treatment needs. *Id.* ¶¶ 91-98.

Based on the foregoing, Plaintiffs bring claims for legal and equitable relief under ERISA, 29 U.S.C. §§ 1132(a)(1)(B), (a)(3), and (c)(1). *Id.* ¶ 1; *see id.* at 15 (First Cause of Action for Recovery of Benefits Due Under an ERISA Benefit Plan), 16 (Second Cause of Action for Breach of Fiduciary Duty). Plaintiffs also allege SAG-AFTRA violated the MHPAEA and the California Parity Act, but do not assert separate claims based on those violations. *See id.* at 9-17.

## LEGAL STANDARD

Rule 8(a) requires that a complaint contain a "short and plain statement of the claim

4

showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). A complaint must therefore provide a defendant with "fair notice" of the claims against it and the grounds for relief. *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (internal quotations and citation omitted).

A court may dismiss a complaint under Rule 12(b)(6) when it does not contain enough facts to state a claim to relief that is plausible on its face. *Id.* at 570. "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). "The plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (quoting *Twombly*, 550 U.S. at 557). "While a complaint attacked by a Rule 12(b)(6) motion to dismiss does not need detailed factual allegations, a plaintiff's obligation to provide the 'grounds' of his 'entitle[ment] to relief' requires more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do. Factual allegations must be enough to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555 (internal citations and parentheticals omitted).

In considering a motion to dismiss, a court must accept all of the plaintiff's allegations as true and construe them in the light most favorable to the plaintiff. *Id.* at 550; *Erickson v. Pardus*, 551 U.S. 89, 93-94 (2007); *Vasquez v. Los Angeles Cty.*, 487 F.3d 1246, 1249 (9th Cir. 2007). In addition, courts may consider documents attached to the complaint. *Parks Sch. of Bus., Inc. v. Symington*, 51 F.3d 1480, 1484 (9th Cir. 1995) (citation omitted).

If a Rule 12(b)(6) motion is granted, the "court should grant leave to amend even if no request to amend the pleading was made, unless it determines that the pleading could not possibly be cured by the allegation of other facts." *Lopez v. Smith*, 203 F.3d 1122, 1127 (9th Cir. 2000) (en banc) (internal quotations and citations omitted). However, the Court may deny leave to amend for a number of reasons, including "undue delay, bad faith or dilatory motive on the part of the movant, repeated failure to cure deficiencies by amendments previously allowed, undue prejudice to the opposing party by virtue of allowance of the amendment, [and] futility of amendment." *Eminence Capital, LLC v. Aspeon, Inc.*, 316 F.3d 1048, 1052 (9th Cir. 2003) (citing *Foman v. Davis*, 371 U.S. 178, 182 (1962)).

## DISCUSSION

SAG-AFTRA moves to dismiss the TAC on the ground that it fails to state a claim under ERISA.

**A.     ERISA – Denial of Benefits**

1.     Applicable Legal Standard

In order to state a claim for denial of benefits under ERISA, Plaintiffs must allege plausible facts showing they were owed benefits under the SAG Plan. *Elizabeth L. v. Aetna Life Ins. Co.*, 2014 WL 2621408, at *2 (N.D. Cal. June 12, 2014) (citing 29 U.S.C. § 1132(a)(1)(B); *Iqbal*, 556 U.S. at 677). This requires Plaintiffs to allege (1) the existence of an ERISA plan, and to identify (2) "the provisions under the plan that entitle [them] to benefits." *Forest Ambulatory Surgical Assocs., L.P. v. United HealthCare Ins. Co.*, 2011 WL 2748724, at *5 (N.D. Cal. July 13, 2011); *accord Almont Ambulatory Surgery Ctr., LLC v. UnitedHealth Grp., Inc.*, 99 F. Supp. 3d 1110, 1557-58 (C.D. Cal. 2015) (citing *Forest Ambulatory* for same proposition); *Steelman v. Prudential Ins. Co. of Am.*, 2007 WL 2009805, at *6 (E.D. Cal. July 6, 2007) (complaint must sufficiently allege how defendant's actions violated a plan term of ERISA to rise above speculative level).

2.     Relevant SPD Terms

In the "Hospital Benefits (including mental health and substance abuse treatment)" section, the SPD states that "[n]on-network services are only covered in the event of an emergency." *Id.* at 32. The SPD's summary charts listing hospital deductibles, coinsurance, and out-of-pocket maximums show "No Coverage" under any plan for non-network hospitals. *Id.* at 32-33. "Emergencies" are covered at both network and non-network hospitals "within 72 hours after an accident or within 24 hours of a sudden and serious illness." *Id.* at 34. Beneficiaries are instructed to call the Plan administrator within 48 hours of admission to a non-network hospital in connection with a mental health or substance abuse emergency to report the emergency admission. *Id.* at 40. The SPD sets forth different types of (in-network) hospital coverage for benefits "other than mental health and substance abuse" (*id.* at 34-35) and for "mental health and substance abuse

(Plan I Only)" (*id.* at 35-36).² Hospital benefits for mental health and substance abuse include in-patient care at a 24-hour medical facility, treatment provided in a 24-hour non-medical facility (residential treatment centers), treatment that is provided for 6-8 hours a day (partial hospital programs), and treatment that is provided for 2-3 hours per day (intensive outpatient programs). *Id.* at 35. Non-covered hospital expenses include "[a]ll expenses at a non-network hospital, except for emergency treatment." *Id.* at 36.

Plan I participants are eligible for medical benefits, including treatment for mental health and substance abuse benefits. *Id.* The SPD summary charts describe the different deductibles, copays, coinsurance, and out-of-pocket maximums participants will pay depending on whether they obtain treatment in- or out-of-network. *See id.* at 36-37. Mental Health and Substance Abuse Benefits, whether obtained in- or out-of-network, include professional fees for listed diagnoses, fees for seeing a psychiatrist or psychopharmacologist for drug management, and fees for psychotherapy. *Id.* at 43. The Benefits Summary charts reiterate that "non-network provider" hospitals are not covered, and that "non-network provider" mental health and substance abuse hospitals and alternative levels of care are "not covered." *Id.* at 110-12 (for Plan I only). It also reiterates that "[e]mergency treatment within 72 hours after an accident or within 24 hours of a sudden and serious illness will be covered at the Network Level of Benefits." *Id.* at 110.

### 3. Prior Orders

In dismissing the First Amended Complaint ("FAC") for failing to state a claim, the undersigned granted Plaintiffs leave to amend the ERISA claim if they could allege W.R.'s admissions to the two non-network treatment facilities were for emergency treatment under the terms of the SAG Plan. *See* First Order at 4, Dkt. No. 29; FAC, Dkt. No. 21. In the Second Amended Complaint ("SAC"), Plaintiffs alleged that W.R. was admitted to mental health treatment facilities for years due to "continuing, unrelenting, and seemingly incurable" symptoms, and that he was admitted to Ascend Recovery due to those continuing symptoms. SAC ¶¶ 15-35, Dkt. No. 31. After his initial admissions, W.R. was discharged from, then readmitted at both

---

² Plan II does not include coverage for the treatment of mental health and substance abuse conditions. SPD at 37.

Ascend Recovery and Spring Lake Ranch. *Id.* ¶¶ 35-36. The SAC alleged these admissions constituted emergencies because W.R. experienced a sudden and serious mental illness that his treatment team at UNI determined placed him at risk of serious injury or death if he did not receive inpatient treatment. *Id.* ¶¶ 34, 41. The SAC alleged W.R.'s treaters at UNI recommended he be admitted to Ascend Recovery and Spring Lake Ranch; it did not allege that those were the only residential treatment programs that could provide the medically-necessary treatment W.R. required. In dismissing the SAC for failing to state a claim, the undersigned held:

> The SPD defines emergency treatment as treatment obtained "within 72 hours after an accident or within 24 hours of a sudden and serious illness." SPD at 34. Plaintiffs accuse Defendant of conflating the long-standing nature of Plaintiff's illness with the sudden increase in acuity of his symptoms that precipitated W.R.'s emergency admission at Ascend Recovery and Spring Lake. Opp'n at 4. The SPD does not exclude such increases in acuity from the definition of emergency treatment. However, the SAC does not allege W.R.'s admittance at Ascend Recovery or Spring Lake Ranch took place within 24 hours of a sudden increase in acuity of his symptoms; nor does the SAC allege W.R. received all of his treatment (i.e., each time he was readmitted) within 24 hours of an emergency. *See* SAC. As such, the SAC fails to show W.R.'s admissions at Ascend Recovery or Spring Lake Ranch qualify as emergency treatment under the SAG Plan.

Second Order at 7-8, Dkt. No. 35. The Court gave Plaintiffs leave to amend a final time. *Id.* at 11.

    4.    <u>Whether the TAC Alleges Facts Amounting to "Emergency Treatment"</u>

The TAC continues to illustrate W.R.'s serious mental illness. *See* TAC ¶¶ 13-16, 20-21, 29, 35-51. It also alleges facts sufficient to show that each of W.R.'s admittances to Ascend Recovery and Spring Lake Ranch took place when he was in a state of acute mental health crisis and that his life and health were in jeopardy. But the TAC insufficiently alleges W.R.'s admittances to Ascend Recovery or Spring Lake Ranch took place within 24 hours of a sudden increase in the acuity of his symptoms.[3] The TAC does not allege W.R.'s condition ever

---

[3] In its Second Order, the Court stated the SAC did not "allege W.R. received all of his treatment (i.e., each time he was readmitted) within 24 hours of an emergency." *Id.* at 8. SAG-AFTRA now argues the SPD limits coverage for out-of-network treatment for emergency services to a total of 24 hours after an emergency arises. *See* Mot. at 4; Reply at 3-4. The Court clarifies that it did not in its Second Order, nor here, endorse SAG-AFTRA's interpretation that the SPD only provides coverage for out-of-network treatment for emergency services that is *completed* within 24 hours of

improved; on the contrary, it alleges W.R. experienced a continuous state of severe illness that manifested in episodes of paranoid and delusional thinking, in which W.R. experienced a series of delusions. *See, e.g.*, *id.* ¶¶ 38-39, 44-46, 48-49. The TAC alleges W.R. was in a state of crisis each time he was admitted, but it still does not allege dates with sufficient clarity to show W.R. was admitted within 24 hours of a *sudden increase* in the acuity of his symptoms.[4] The seriousness of W.R.'s condition is unquestionably alleged, but the fact he could hurt himself or others because of his serious condition does not, in and of itself, show that he qualified for emergency services under the facts alleged.

*City of Hope National Medical Center v. Seguros de Servicios de Salud de Puerto Rico, Inc.*, 983 F. Supp. 68 (D. P.R. 1997), is instructive. In *City of Hope*, a hospital treated a patient diagnosed with acute myeloid leukemia with high-dose chemotherapy and bone marrow transplantation. *Id.* at 70. The patient's insurance companies refused to pay for the services, one on the ground the policy excluded bone marrow transplants, and the other on the ground the patient had not requested preauthorization as required by her policy. *Id.* The hospital argued it was entitled to payment because it provided emergency health services, which did not require the patient to obtain preauthorization for the transplant. *Id.* at 76. The insurance contract defined "emergency health services" as "bona fide emergency services provided after the onset of a sudden medical condition apparent though profusely severe and acute symptoms." *Id.* The district court rejected the hospital's argument:

---

an emergency. In its Second Order, and again here, the Court addressed admittance within 24 hours of an emergency. Even if the Court were to agree with SAG-AFTRA's interpretation, this would not be a ground to dismiss the denial of benefits claim, as SAG-AFTRA might still be liable to pay for the costs of treatment rendered within 24 hours of the emergency.

[4] While the TAC alleges Ascend Recovery and Spring Lake Ranch are residential treatment programs, it does not allege facts showing these facilities provide emergency services. Furthermore, the TAC does not allege Plaintiffs complied with the SPD's instructions that members who "are admitted to a non-network hospital should call one of the following within 48 hours to report the emergency admission" – including for mental health or substance abuse (SPD at 34) in connection with any of W.R.'s "many" admissions to Ascend Recovery and Spring Lake Ranch. Plaintiffs did not allege the admissions were emergencies until they filed the SAC, after the Court gave them leave to allege, "consistent with their obligations under Rule 11, [that] coverage existed because W.R. received emergency treatment at these facilities." *See* Compl., Dkt. No. 1 (alleging treatment was "medically necessary" but not that it was provided due to an emergency); FAC (same); First Order at 8.

9

> The services provided by City of Hope to Mrs. Díaz were not provided "after the onset of a sudden medical condition." Mrs. Díaz' condition had been latent for some time. In fact, after her relapse, she received treatment and was transferred from two different hospitals before being admitted to City of Hope. The pain and suffering Mrs. Díaz endured as a consequence of her disease is a very sad matter indeed. But, we agree with Co-defendant PCA that the terms of the contract are clear, and that a serious condition is not the same as one requiring emergency services so as to preclude the pre-authorization procedures mandated by the contract.

*Id.* The TAC alleges that, like Mrs. Díaz, W.R. suffered from a serious condition for a very long time. But the facts in the TAC do not show that he was admitted to Ascend Recovery or Spring Lake Ranch each time within 24 hours of a "sudden" change in his ongoing serious illness.

The Court once again finds Plaintiffs have not shown W.R.'s multiple admittances to these out-of-network residential treatment facilities were emergencies within the terms of the SPD. As such, the Court once again GRANTS Defendant's Motion to Dismiss the first cause of action.

### B. MHPAEA & California Parity Act

The Court previously rejected Plaintiffs' arguments that the Plan violated the MHPAEA and California Parity Act. *See* First Order at 8-11. The TAC re-alleges the identical facts the Court found insufficient to state a claim under either statute. *Compare* TAC ¶¶ 58-74 & 83-90, *with* SAC ¶¶ 42-67; *see also* Opp'n at 14-22 (acknowledging Court's prior findings and order and asking court to reconsider the same issues). The Court reincorporates its previous findings and conclusion here by reference. The TAC sets forth no new allegations concerning SAG-AFTRA's alleged violation of the California Parity Act. The Court will not revisit the sufficiency of the same allegations it previously rejected, and will only address Plaintiffs' new factual allegations concerning SAG-AFTRA's alleged violations of the MHPAEA:

(1) Plaintiffs allege, "[u]pon information and belief, the SAG Plan does not apply its network tier design limitations for inpatient, out-of-network benefits in a comparable manner to mental health/substance abuse and medical/surgical benefits." TAC ¶ 77. "The *Twombly* plausibility standard, which applies to all civil actions, does not prevent a plaintiff from pleading facts alleged 'upon information and belief' where the facts are peculiarly within the possession and control of the defendant, or where the belief is based on factual information that makes the

inference of culpability plausible." *Arista Records, LLC v. Doe 3*, 604 F.3d 110, 120 (2d Cir. 2010) (internal marks and citations omitted). Courts in this Circuit, including the Ninth Circuit, frequently rely on the *Arista Records* standard. *See Park v. Thompson*, 851 F.3d 910, 928-29 (9th Cir. 2017) (quoting *Arista Records*); *Slack v. Int'l Union of Operating Eng'rs*, 83 F. Supp. 3d 890, 900 (N.D. Cal. 2015) ("Because details of the precise nature of [d]efendants' management practice rests solely in the hands of [d]efendants at this juncture, greater specificity is not required at this pleading stage." (citing *Arista Records*, 604 F.3d at 120-21, additional citations omitted)); *Cisco Sys., Inc. v. STMicroelectronics, Inc.*, 2015 WL 3488923, at *4 (N.D. Cal. June 2, 2015) (adopting *Arista Records* standard); *Circle Click Media LLC v. Regus Mgmt. Grp. LLC*, 2013 WL 57861, at *6 (N.D. Cal. Jan. 3, 2013) ("Rule 8 pleading standards do not prevent a plaintiff from 'pleading facts alleged upon information and belief where the facts are peculiarly within the possession and control of the defendant[.]'" (quoting *Arista Records*, 604 F.3d at 120)). Plaintiffs' allegation is purely conclusory and does not establish any basis for their belief; it is not "based on factual information that makes the inference of culpability plausible." And while specific facts regarding how the SAG Plan applies its network tier design limitations for inpatient, out-of-network benefits in a comparable manner to mental health/substance abuse and medical/surgical benefits, might be facts peculiarly within SAG-AFTRA's possession and control, neither the language of the SPD nor any of the well-pleaded factual allegations in the TAC support this conclusory allegation.

(2) Plaintiffs allege the SAG Plan utilizes different third-party administrators for medical/surgical and mental health/substance abuse benefits. TAC ¶ 78. Without additional facts showing how the SAG Plan utilizes third-party administrators, or how the third party administrators provide materially different coverage or benefits, this allegation does not show the selection of administrators was made with the intent or effect of providing different levels of services for these two categories of services.

(3) Plaintiffs allege the SAG Plan explicitly allows for exceptions to its limitations on out-of-network hospital benefits, including for treatment received at skilled nursing facilities[5]; for

---

[5] The Court previously rejected Plaintiffs' arguments regarding the SPD's alleged unequal treatment of skilled nursing facilities. *See* First Order at 8-10.

participants who live in a network area and are being treated for a serious condition and are referred to a specialist but there are no network specialists in the area; serious conditions include "conditions such as cancer and cardiac surgery. It does not include situations of a non-serious nature, such as chiropractic and acupuncture"—the Plan does not use any mental health or substance use conditions to illustrate what may qualify as a serious condition. *Id.* ¶¶ 79-82; *see also* Opp'n at 13-14 ("Plaintiffs' allegations are supported by language in the plan that identifies only physical ailments as ones which may be granted out-of-network coverage exceptions" and by language on the SAG Plan's website that similarly illustrates when the Plan will pay the in-network level of benefits for out-of-network treatment solely with physical conditions."). The language of the SPD defeats Plaintiffs' argument. The SPD lists its preferred provider networks, including ValueOptions for Mental Health and Substance Abuse treatment. SPD at 31. The SPD includes *the same asterisk* for both Hospital and Medical and for Mental Health and Substance Abuse:

> If you need hospital or medical services and you live more than 25 miles from two providers of any type who participate in [the preferred] network you are considered to be outside a network area but will receive the Network Level of Benefits for these services. However, if you travel to a network area, you must use network providers to obtain the higher level of benefits. *These same rules apply to Plan I participants who need mental health or substance abuse treatment and live more than 25 miles from two facilities or providers of any type who participate in [the preferred] network.*

SPD at 31 (emphasis added). In the next paragraph, the SPD also provides that the Plan will pay network level of benefits rendered by a non-network specialist "[i]f a participant who lives in a network area is being treated for a serious condition that requires a specialist's care, and there are no network specialists in his or her area." *Id.* The SPD states a serious condition "includes conditions such as cancer and cardiac surgery. It does not include situations of a non-serious nature, such as claims for chiropractic or acupuncture." *Id.* The physical conditions Plaintiffs focus on are illustrations; they in no way support Plaintiffs' allegation that only physical conditions are covered at in-network level of benefits. The SPD does not exclude mental illness

12

and substance abuse from its definition of "serious conditions." *Id.*[6]

(4) Plaintiffs allege, "[u]pon information and belief, the SAG Plan both as written and in operation violates the MHPAEA by granting exceptions to its out-of-network coverage limitations for inpatient medical/surgical benefits including but not limited to cancer and cardiac treatment at a rate and using processes, strategies, evidentiary standards and/or other factors applied to exception requests for out-of-network inpatient mental health specialist treatment." TAC ¶ 82. Plaintiffs allege no factual basis for their information and belief, and the language of the SPD itself does not support their allegations. *See supra*; *see also* Second Order. The Court thus cannot find that this allegation meets the plausibility standard.

To the extent Plaintiffs assert claims based on violations of the MPHAEA or the California Parity Act, the TAC fails to show SAG-AFTRA violated either statute.

## C. ERISA – Breach of Fiduciary Duty

As the administrator of an ERISA plan, SAG-AFTRA owes a fiduciary duty to SAG Plan participants and beneficiaries. 29 U.S.C. § 1104(a). The "prudent man standard of care" requires SAG-AFTRA to discharge its duties "with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims[.]" 29 U.S.C. § 1104(a)(1)(B).

Plaintiffs' second cause of action alleges SAG-AFTRA breached its fiduciary duty under ERISA by (1) denying W.R.'s residential mental health treatment benefits based on an out-of-network treatment limitation in violation of the MHPAEA and California Parity Act; (2) failing to maintain an adequate network of mental health providers; and (3) failing to propose a qualified, safe, and appropriate in-network provider with an available treatment bed. TAC ¶ 111; *see also id*. ¶¶ 91-98 (alleging the Plan failed to maintain an adequate network). They concede that the mere denial of an individual benefit claim does not violate the fiduciary duties owed under ERISA, but argue the TAC alleges failings that "apply much more broadly than to Plaintiff's

---

[6] The TAC does not allege either Ascend Recovery or Spring Lake Ranch were "specialists" or that the same type of specialists were not available in-network.

13

individual claim for benefits at issue in this action." Opp'n at 9. For the following reasons, the Court finds Plaintiffs do not state a claim on any of the failings they allege in the TAC.

First, the Court already found the TAC does not state a claim for violation of the MHPAEA or the California Parity Act. Plaintiffs therefore cannot base a claim for breach of fiduciary duty on those allegations.

Second, Plaintiffs' allegations that SAG-AFTRA failed to maintain an adequate network of mental health providers are purely conclusory. Plaintiffs allege SAG-AFTRA uses different administrators for medical and mental health benefits and offers different provider networks. Plaintiffs only conclusorily allege on "information and belief" that the Plan did not offer an adequate network of residential treatment facilities that could provide the care W.R. required and that the network of intermediate mental health providers was not comparable to the network of intermediate medical/surgical care providers. *See* TAC ¶¶ 92-97. Plaintiffs are entitled to plead allegations on information and belief, but these are subject to the *Arista Records* standard. While the differences between the Plan's mental health and medical/surgical networks might be "peculiarly within the possession and control" of SAG-AFTRA, Plaintiffs would possess facts about their attempts to obtain in-network treatment which were thwarted by a lack of options. Nevertheless, the TAC is devoid of such allegations: Plaintiffs do not allege they looked for in-network facilities that were appropriate for W.R. or asked SAG-AFTRA to identify such facilities; nor do Plaintiffs allege W.R.'s treating physicians recommended Ascend Recovery and Spring Lake Ranch because these facilities provided treatment options that were not available through covered in-network residential treatment facilities. In short, there are no facts to support Plaintiffs' contention that SAG-AFTRA failed to maintain an adequate network of mental health providers. Plaintiffs' allegations are conclusory.

Finally, the TAC fails to state a claim based on SAG-AFTRA's failure to provide information to W.R. about in-network providers. In the section entitled "Locating a Network Provider" the SPD explains it does not print provider directories because new providers are continually being added, but advises participants they "can always find out if a particular provider is in the network or obtain a list of providers in your area at no charge by visiting the Plan's

14

website . . . or contacting the networks at the numbers or websites shown to the right." SPD at 30. In the section entitled "Hospital Benefits for Mental Health and Substance Abuse" (including inpatient care and alternative levels of care such as residential treatment centers), the SPD further advises that"[i]f you have a question about a particular mental health or substance abuse condition and whether it is covered please contact ValueOptions at [contact information]." *Id.* at 35. ERISA does not require a trustee to remind plan participants of information already contained in the SPD or to anticipate all potential situations individual benefits might face. *Echague v. Met. Life Ins. Co.*, 43 F. Supp. 3d 994, 1020 (N.D. Cal. 2014) (citing cases). "The SPD is the statutorily established means of informing participants of the terms of the plan and its benefits and the employee's primary source of information regarding employment benefits. An insured has a duty to read his policy and is bound by its provisions even if he did not read or understand them." *Minton v. Deloitte & Touche USA LLP Plan*, 2011 WL 2181654, at *4 (N.D. Cal. June 3, 2011) (internal quotation marks and citations omitted).

Plaintiffs rely entirely on *Echague* for the proposition that fiduciaries have an affirmative duty to provide information to plan participants. *See* Opp'n at 10 (citing *Echague*, 43 F. Supp. 3d at 1018). In *Echague*, the court found the fiduciary had breached its duties because its response to a beneficiary's inquiries was not complete and accurate; the court also cited cases standing for the proposition that a fiduciary has an obligation to convey complete and accurate information material to the beneficiary's circumstance even when the beneficiary has not specifically asked for the information. *Id.* at 1017-20. But there are no allegations that Plaintiffs made inquiries to SAG-AFTRA, that SAG-AFTRA failed to respond to those inquiries completely and accurately, or that SAG-AFTRA was even aware of Plaintiffs' circumstances so as to require it to provide information about in-network residential treatment programs. Indeed, the TAC does not allege Plaintiffs checked for in-network residential treatment programs, informed SAG-AFTRA before or during any of W.R.'s admittances to Ascend Recovery or Spring Lake Ranch that W.R. needed residential mental health treatment, asked SAG-AFTRA whether treatment at these facilities was covered, or asked SAG-AFTRA to identify covered facilities. In short, the TAC does not allege Plaintiffs contacted SAG-AFTRA at any point regarding W.R.'s residential facility treatment

15

before submitting their claims.  Instead, Plaintiffs only allege SAG-AFTRA "fail[ed] to propose a qualified, safe and appropriate in-network provider with an available treatment bed."  TAC ¶ 111.  This is insufficient to show SAG-AFTRA breached its fiduciary obligations under ERISA.  Accordingly, the Court DISMISSES the second cause of action.

## CONCLUSION

For the foregoing reasons, the Court finds Plaintiffs have not stated a claim under ERISA and GRANTS the Motion to Dismiss.  The Court has twice afforded Plaintiffs leave to amend.  Because nothing in the record allows the Court to find Plaintiffs possess facts that they could not have previously alleged to support their claims, the Court finds granting leave to amend a third time would be futile.  *See Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1116 (9th Cir. 2014) (district court did not abuse its discretion in denying leave to amend third amended complaint where amendment would be futile and plaintiff had amended his complaint several times).  As a result, the TAC is dismissed WITH PREJUDICE.

**IT IS SO ORDERED.**

Dated: November 27, 2017

_____
MARIA-ELENA JAMES
United States Magistrate Judge